**WEST VIRGINIA UNIVERSITY HOSPITALS, INC., Plaintiff,**

**v.**

**Robert CASEY, Governor, et al., Defendants.**

**Civ. A. No. 86–0955.**

United States District Court, M.D. Pennsylvania.

Nov. 30, 1988.

Robert T. Adams, Julia Claire Krebs–Markrich, Edward M. Macon, McGuire, Woods, Battle & Boothe, Richmond, Va., Jack M. Stover, Shearer, Mette, Evans and Woodside, Harrisburg, Pa., for plaintiff.

Jerome Foerster, Dist. Atty. Gen., Harrisburg, Pa., Diane Bartels, DPW Office of Legal Counsel, Philadelphia, Pa., for defendants.

## MEMORANDUM

RAMBO, District Judge.

*Background*

West Virginia University Hospitals, Inc. (WVUH or the Hospital) commenced this action against the Commonwealth of Pennsylvania's Department of Public Welfare and individuals on July 26, 1986. Pursuant to stipulation, the Department of Public Welfare was dismissed as a defendant on February 25, 1987. WVUH brought this action under 42 U.S.C. section 1983 alleging Pennsylvania's medicaid reimbursement program for out-of-state hospitals violates federal payment standards and violates the equal protection clause of the fourteenth amendment of the United States Constitution. Plaintiff further alleges Pennsylvania's administrative appeals system for out-of-state hospitals is legally inadequate. The Hospital seeks injunctive and declaratory relief regarding its past treatment under Pennsylvania's reimbursement program and administrative appeals system. The trial in this action took place before the court on May 2, 3, 4, 5, 6, and 16, 1988. The parties have been given an opportunity to present arguments and proposed findings of fact and conclusions of law. The opinion of the court follows.

*Findings of Fact*

In accordance with Federal Rule of Civil Procedure 52(a) the court finds the following facts.

### I. The Parties

1. WVUH is a non-stock, non-profit corporation organized under the laws of West Virginia. Plaintiff's Pretrial Memorandum Undisputed Facts No. 1. (Hereinafter referred to as "Facts.")

2. Defendant Robert P. Casey is the Governor of the Commonwealth of Pennsylvania. Facts 2.

3. The Secretary of the Department of Public Welfare (the Secretary) of Pennsylvania was Walter C. Cohen at the time this action was filed. The Secretary is now John F. White, Jr. Facts 3.

4. The Secretary reports to the Governor of Pennsylvania. The Secretary is responsible for implementing, administering and operating the medicaid program in Pennsylvania. The medicaid program in Pennsylvania is called the "Medicaid Assistance Program" (MAP). Facts 4.

5. Since November, 1987, David S. Feinberg has been Acting Director of the proposed Office of Hospital and Outpatient Programs in the Department of Public Welfare (the Department or DPW). From 1979 to November, 1987, Feinberg was the Director of the Bureau of Policy and Program Development. Facts 5.

6. Feinberg was responsible for the development of Pennsylvania's medicaid program's prospective payment system. Facts 6.

### II. The Hospital

7. WVUH is located six miles south of the border between the State of West Virginia and the Commonwealth of Pennsylvania. Facts 10.

8. The primary service area of the Hospital includes the West Virginia counties of Monongalia, Marion, Harrison, Taylor, Doddridge and Preston and the Pennsylvania counties of Fayette and Greene. Facts 11.

9. Generally, Pennsylvania residents constitute approximately 16% of all WVUH inpatient admissions. Testimony of Katherine Douglass, Transcript [1] at 163, lines 6, 15–17.

10. In 1985, 2,500 inpatient admissions to WVUH were attributable to Pennsylvania residents. 860 of the admissions were Pennsylvania medicaid recipients. Testimony of Katherine Douglass, Transcript at 163, lines 15–20.

11. Approximately 204,000 people lived in Fayette and Greene counties in the mid–1980s. By the late 1980s, the population in Fayette and Greene counties is projected to

---

**1.** Citations to "Transcript" refer to the trial transcript. Because some trial testimony was transcribed on an expedited basis during trial, citations to that testimony will be, for example,

"May 4, 5, and 6, 1988 Transcript." Deposition testimony will be cited similarly, i.e., "December 28, 1986 Vertrees Deposition."

grow to 209,000 people. Testimony of Katherine Douglass, Transcript at 158, lines 20–25.

12. 1,200 persons from Fayette County received inpatient care at WVUH in 1985; 1,100 persons from Greene County received inpatient care. Testimony of Katherine Douglass, Transcript at 163, lines 21–25; 164, lines 1–7.

13. The Hospital also serves patients from Washington County, Pennsylvania. In calendar year 1985 the Hospital had 102 Pennsylvania medicaid admissions from Washington County, Pennsylvania. Facts 14.

*Services Provided*

14. A "tertiary care" hospital is a hospital that provides a level of hospital and medical services that is inherently more complex and that is generally not provided in small or community hospitals. Testimony of Bernard Westfall, Transcript at 33, lines 2–25; 34, lines 1–25; 35 lines 1–15.

15. WVUH is the closest source of tertiary care services to many individuals living in Greene and Fayette counties. Testimony of Katherine Douglass, Transcript at 159, lines 11–25; 160–161; 162, lines 1–24.

16. Some Pennsylvania medicaid recipients who reside in Fayette, Greene and parts of Washington counties, and who must use the Hospital for complex or specialized medical services, otherwise must travel 20 to 70 additional miles to Pittsburgh, Pennsylvania, the next closest city (to the Hospital) in which such services are offered. Facts 16.

17. Specialized or complex inpatient services available at the Hospital which are not available in the Pennsylvania hospitals in Fayette, Greene, and Washington counties include cardiac catheterization, angiography, open heart surgery, high risk obstetrics, neonatal intensive care, kidney transplant lithotripsy. Testimony of Katherine Douglass, Transcript at 159, lines 16–25; 160, lines 1–25; 161, lines 1–25; 162, lines 1–25; 163, lines 1–25; 164, lines 1–25; 165, lines 1–25; 166 lines 1–3. Facts 17.

18. WVUH is a Level I trauma center equipped to deal with head and spine injuries as well as cardiac and other emergencies. It is the only Level I trauma center in the service area of WVUH. The next closest Level I trauma center is located in Pittsburgh. Testimony of Katherine Douglass, Transcript at 160, lines 11–25; 161, lines 1–5.

19. WVUH provides an extensive prenatal referral system for high risk neonates and, as part of that system, provides high risk prenatal services to hospitals in the service area, including Greene County Memorial Hospital located in Greene County, Pennsylvania. Testimony of Katherine Douglass, Transcript at 161, lines 6–25; 162, lines 1–24.

20. WVUH also provides specialized outpatient services to Pennsylvania residents. These services include pediatric cardiology, pediatric neurology, neurosurgery, and other highly technical types of care. Testimony of Katherine Douglass, Transcript at 165, lines 16–22.

21. The outpatient services identified in the paragraph above are not available at hospitals located in Fayette and Greene counties. If patients did not use WVUH for such services, the next closest hospital would be located in Pittsburgh. Testimony of Katherine Douglass, Transcript at 165, lines 23–25; 166, lines 1–3.

22. WVUH also provides Pennsylvania residents with routine hospital care such as routine obstetrics, normal newborn care and tonsillectomies. Defendants' Exhibit 76.

23. The types of routine cases seen at WVUH are similar to the routine types of cases seen at most university teaching hospitals. Testimony of James Vertrees, Transcript at 77, lines 8–14.

24. WVUH has approximately the same Case Mix Index (CMI) as university teaching hospitals located in Pennsylvania and other similarly situated hospitals. Plaintiff's Exhibit 66.

*WVUH is a University Affiliated Teaching Hospital*

25. The Hospital is a university affiliated teaching hospital: the West Virginia

University uses the Hospital to train health professionals. Facts 39.

26. WVUH is a major academic medical center, one of only 121 such centers in the country. Testimony of Gerard Anderson, Transcript at 392, lines 1–12.

27. 1,300 persons completed their physician and dentist residency training programs at the Hospital between 1960 and 1984. Facts 40.

28. Approximately 7% of the 1,664 total living alumni of the West Virginia University School of Medicine's four-year medical program live in Pennsylvania. Facts 47.

29. MAP recognizes that the provision of graduate medical education programs improves the quality of care at a hospital. Testimony of Gerard Anderson, Transcript at 320, lines 12–23. Plaintiff's Exhibit 8.

*WVUH's Medicaid Volume*

30. Historically, WVUH has provided significant numbers of Pennsylvania medicaid recipients with hospital care.

31. In Calendar year 1981, the Hospital treated 610 Pennsylvania medicaid admissions on an inpatient basis. Facts 22.

32. In calendar year 1982, the Hospital treated 692 Pennsylvania medicaid admissions on an inpatient basis. Facts 23.

33. In calendar year 1983, the Hospital treated 783 Pennsylvania medicaid admissions on an inpatient basis. Facts 24.

34. In calendar year 1984, the Hospital treated 828 Pennsylvania medicaid admissions on an inpatient basis. Facts 25.

35. In calendar year 1985, the Hospital treated 853 Pennsylvania medicaid admissions on an inpatient basis. Facts 26.

36. In calendar year 1986, the Hospital treated 840 Pennsylvania medicaid admissions on an inpatient basis. Facts 27.

37. In calendar year 1987, the Hospital treated 552 Pennsylvania medicaid admissions from the period January 1 through September 30, 1987. Facts 28.

38. The number of patients identified in paragraphs 31 through 37 above does not include the number of Pennsylvania medicaid recipients who utilized the outpatient services of the Hospital. Facts 29.

39. The annual number of outpatient visits at the Hospital attributable to Pennsylvania medicaid recipients ranges from 7,000 to 7,500. Facts 30.

40. Pennsylvania medicaid recipients residing in Fayette, Greene, and Washington counties have "freedom of choice" in selecting their medical care providers. This means absent special rules, (none of which are applicable to this case), Pennsylvania recipients of medicaid may use the services of any hospital they choose. Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 124, lines 22–25; 125, lines 1–25; 126, lines 1–25; 127, lines 1–21.

41. Some Pennsylvania residents, including Pennsylvania medicaid recipients, living in the counties of Fayette, Greene, and Washington desire and require access to the Hospital's services and facilities. Facts 32.

42. In fiscal years 1984–85, 1985–86 and 1986–87, WVUH provided inpatient hospital care to more Pennsylvania medicaid patients than over one-half of the hospitals located in Pennsylvania. Testimony of Thomas Manak, Transcript at 251, lines 8–25, 252, lines 1–7. Plaintiff's Exhibit 51(a).

43. Five percent of all WVUH inpatient admissions are attributable to Pennsylvania medicaid recipients. Testimony of Stephen Pickett, Transcript at 170, lines 12–13; 175, lines 18–20.

44. In addition to serving Pennsylvania recipients, the Hospital served the following numbers of West Virginia medicaid admissions on an inpatient basis:

| | |
|---|---|
| July 1, 1982—June 30, 1983 | 2,049 |
| July 1, 1983—June 30, 1984 | 2,261 |
| July 1, 1984—December 31, 1984 | 1,181 |
| Calendar Year 1985 | 2,319 |
| Calendar Year 1986 | 1,848 |
| January 1, 1987—October 31, 1987 | 1,618 |

45. Twenty-three percent of all WVUH inpatient admissions are recipients of medicaid. Testimony of Stephen Pickett, Transcript at 170, lines 8–9.

46. Seventeen percent of all WVUH inpatient admissions are West Virginia

medicaid recipients. Testimony of Stephen Pickett, Transcript at 170, lines 12, 13.

*WVUH's Incorporation History*

47. In 1982 the West Virginia Board of Regents commissioned a study to determine how to resolve deficiencies cited by the national accreditation board for hospitals. The West Virginia Board of Regents was advised that given the structural problems of the existing facility, it was more prudent to replace the facility than to renovate it. Testimony of Bernard Westfall, Transcript at 49, lines 22-25; 50, lines 1-25; 51, lines 1-25; 52, lines 1-19.

48. The West Virginia legislature concurred. *See* § 18-11C-2(c) of the Code of West Virginia.

49. The entity that the legislature created to operate the facility is WVUH. Testimony of Bernard Westfall, Transcript at 59, lines 18-20.

50. WVUH and its predecessor entity, West Virginia University Hospital, are the same. They are both creatures of the West Virginia legislature and subject to its control. The legislature simply changed the form of the hospital organization. Testimony of Bernard Westfall, Transcript at 142, lines 12-25.

51. The West Virginia legislature has never relinquished ownership of the Hospital's assets and control. Plaintiff's Exhibit 71. *See* § 18-11C-3 of the Code of West Virginia.

52. The change from West Virginia University Hospital to WVUH was a change in the form of organization, not a change of ownership or control. Testimony of Bernard Westfall, Transcript at 142, lines 12-25; 688, lines 3-13; 690, lines 5-25; 691, lines 1-7.

*The Provider Agreement With MAP*

53. West Virginia University Hospital, the predecessor entity to WVUH, entered into an agreement with the Pennsylvania Medicaid Assistance Program. Defendants' Exhibit 35.

54. The provider agreement, which was not dated, is self-perpetuating unless terminated. Defendants' Exhibit 35.

55. The defendants have never terminated the provider agreement. Testimony of Donna Hoffmaster, Transcript at 482, lines 6-9.

56. MAP has reimbursed WVUH for inpatient services provided to Pennsylvania medicaid patients without interruption, except for one seven week interruption beginning in December, 1987. The reason for withholding payment was due to an alleged failure to report a change in ownership. Testimony of Amy Leopard, May 3, 1988 Transcript at 7, lines 3-25; 8, lines 1-25; 9, lines 1-25, 10, lines 1-13; Plaintiff's Exhibit 67; letter dated December 2, 1987 from Virginia Antonoplos.

57. The payments were interrupted and withheld after MAP employees consulted with counsel for MAP. The interruption of payments was related to this litigation. Testimony of Amy Leopard, May 3, 1988 Transcript at 13, lines 9-21.

58. The defendants offered no evidence demonstrating a change in West Virginia University Hospital's ownership. Defendants testified only that they were aware that WVUH uses a tax payer identification number for its short procedure unit (not related to inpatient care) that is different from some other numbers utilized by WVUH. Testimony of Donna Hoffmaster, Transcript at 477, lines 16-25; 478, lines 1-12.

III. Pennsylvania Medicaid Program Reimbursement of In-State Hospitals

*The Nature of the Medicaid Program*

59. Medicaid is a federal-state program that pays for medical services provided to the eligible poor in accordance with Title XIX of the Social Security Act and the applicable state and federal regulations. Facts 55, 57.

60. The state designs and administers the medicaid program within the broad parameters established by Title XIX of the Social Security Act, implementing federal regulations, and the applicable state laws and regulations. Facts 57.

61. Medicaid is a different program than Medicare. Medicare is a program of health insurance administered by the federal government. Facts 58.

62. The Commonwealth of Pennsylvania participates with the federal government in providing a medicaid program to eligible Pennsylvania residents. Facts 59.

63. As a part of its agreement with the federal government to participate in medicaid, the defendants submitted a state plan for medical assistance to the United States Secretary of Health and Human Services for approval. Facts 60.

64. Pennsylvania's state plan for medical assistance has been approved by the United States Secretary of Health and Human Services, including the Pennsylvania state plan provisions that govern reimbursement of general acute care hospitals which provide health care services to Pennsylvania medicaid recipients. Facts 61.

*The Change From Retrospective "Reasonable Cost" Reimbursement to Prospective Reimbursement*

65. Prior to 1981, the Social Security Act required states to pay hospitals the "reasonable cost" of rendering inpatient hospital services to medicaid recipients. Facts 62.

66. "Reasonable cost" was a term defined and used in the medicare program and adopted for use in the medicaid program. Facts 63.

67. As a general rule, the "reasonable cost" standard of reimbursement meant that states were required to reimburse hospitals their actual, allowable costs (capital costs and operating costs) of the care provided to medicaid recipients. Facts 64.

68. "Reasonable cost" reimbursement was a retrospective form of reimbursement, involving the payment of interim rates during the fiscal year with an end-of-year cost settlement once a hospital reported its claimed actual, allowable medicaid costs. A hospital's reported costs were generally subject to audit. Facts 65.

69. On July 31, 1981, the United States Congress enacted the Omnibus Budget Reconciliation Act of 1981, Public Law 97–35 (OBRA), which changed the requirement that state medicaid programs reimburse hospitals the "reasonable" cost of providing services. Facts 66.

70. Effective for fiscal year 1984–1985, the Commonwealth of Pennsylvania replaced the reasonable cost system of reimbursement for acute care inpatient services in hospitals in the medicaid program. Facts 72.

71. In place of the reasonable cost standard Pennsylvania adopted a "prospective payment system" for acute care inpatient services in hospitals. Facts 73.

72. Under a prospective payment system of reimbursement a hospital is told in advance what its payment will be for specified services. Facts 74.

73. The Pennsylvania prospective payment system was designed, in part, to implement the OBRA standard and to contain the rising cost of health care. Facts 75.

74. One of the goals of Pennsylvania's system of prospective payment is to provide hospitals with the incentive to become more efficient and economical by providing them a fixed amount of reimbursement for each case regardless of the provider's actual costs of treating those cases. Facts 76.

*In–State Hospital Reimbursement of Operating Costs of Inpatient Care Under the MAP Prospective Payment System*

*Grouping*

75. Under Pennsylvania's medicaid prospective payment system of reimbursement, all participating in-state hospitals were separated into seven groups, excluding children's hospitals. Facts 78.

76. The purpose of the grouping system was to place hospitals with similar roles and potential for costs in the same group. December 28, 1988 Deposition of James Vertrees at 35, lines 4–13; 53, lines 11–21. Defendants' Exhibit 2 at 2198.

77. The underlying assumption was that similar hospitals have similar costs and that reimbursement of the average cost of similarly situated hospitals would be an equitable means of payment. Testi-

mony of Thomas Manak, Transcript at 213, lines 14–17.

78. Pennsylvania used a complex formula to identify the similarities among hospitals. Testimony of Thomas Manak, Transcript at 213, lines 18–19.

79. Pennsylvania's groupings for in-state hospitals take into account four concepts: each hospital's teaching status, its medicaid volume, its environmental characteristics, and its hospital costs. Facts 80.

80. Teaching status, medicaid volume, environmental characteristics, and hospital costs are measured by a total of thirteen variables. Facts 81.

81. The variables consist of, *inter alia,* the number of interns and resident programs, medicaid volume, area wage index, and total patients seen at the hospital. Testimony of Thomas Manak, Transcript at 214, lines 15–17.

82. The actual grouping of in-state hospitals is done by computer program after inputting each in-state hospital's data for the thirteen variables. Facts 82.

83. MAP has placed all in-state academic medical centers in Group I. Testimony of Kelly Grotzinger, Transcript at 60, lines 21–25; 602, lines 8–10.

*Group Average Cost Per Case*

84. After all in-state hospitals were grouped into seven groups by the computer, Pennsylvania determined a group average cost per case. This group average cost per case is ultimately used to determine the prospective payment. Facts 83.

85. To ascertain the group average cost per case for each of the groups of in-state hospitals for fiscal years 84–85, 85–86 and 86–87, the defendants identified each hospital's reported Pennsylvania medicaid reimbursable costs for the most recently completed fiscal year, subtracting certain costs specified in the state plan and applicable regulations. Facts 84.

86. The in-state hospital's costs were then divided by the number of Pennsylvania medicaid cases on paid claims history for that in-state hospital for that year. Facts 85.

87. The resulting figure was that particular in-state hospital's average cost per case for the fiscal year from which the cost information was derived. Facts 86.

88. The average cost per case for the hospital was then standardized by a hospital-specific case mix index. Facts 87.

89. The defendants then determined a rate of increase for each in-state hospital's average cost per case by the particular in-state hospital's average cost per case for the preceding fiscal year. Facts 88.

90. The defendants then adjusted the in-state hospital's average cost per case by an inflation rate, if the rate of increase was greater than the rate of inflation for the preceding fiscal year. Facts 89.

91. If the rate of increase was equal to or less than the rate of inflation, then the average cost per case was increased by one-half of the difference between the rate of increase and the rate of inflation for the preceding fiscal year. Facts 90.

92. The defendants projected the in-state hospital's average cost per case to the end of the forthcoming year by multiplying the adjusted average cost per case by a projected inflation rate for the forthcoming fiscal year. Facts 91.

93. For each group of in-state hospitals the defendants added the projected average cost per case for each in-state hospital in a given group, and divided the total by the number of hospitals in that particular group. Facts 92.

94. The resulting figure was the group average cost per case which was then adjusted for budget neutrality. This number was the group rate. Facts 93.

95. A group rate was calculated for each of the seven groups. The hospitals in Group 1 have the highest group rate. The hospitals in Group 7 have the lowest group rate. Testimony of Thomas Manak, Transcript at 220, line 25; 221, lines 1–17; 225, lines 16–24. Defendants' Exhibit 2 at 2198, 2199.

*The Payment Rate for a DRG*

96. To determine how much to pay a hospital for treating a patient with a given illness, MAP multiplies the relative value

of the Diagnostic Related Group (DRG) assigned to the patient's illness by the hospital's group average cost per case. Testimony of Thomas Manak, Transcript at 224, lines 20–22.

97. The higher the group average cost per case, i.e., the hospital's group rate, the higher the payment for a given DRG. Thus, MAP pays a Group 1 hospital more to treat a given DRG than it pays a Group 2, 3, 4, 5, 6 or 7 hospital to treat the same DRG. Testimony of Thomas Manak, Transcript at 225, lines 16–25; 226 lines 1–3.

98. The payment amount for a given case may be adjusted for payments made by a third party payer, patient co-pay or resource obligations, or, if the case qualifies as a day or cost outlier. Facts 97.

99. Under Pennsylvania's prospective payment system, hospitals are paid a set amount per inpatient case for the hospital's operating costs based on the hospital's group rate and the applicable DRG. Facts 98.

100. The DRG system of reimbursement creates "winners" and "losers." A winner is a case where the DRG payment is greater than the actual cost of treating a particular patient. A loser is where costs are more than the DRG payment received. Testimony of Gerard Anderson, Transcript at 314, lines 11–15.

101. On aggregate, the expectation is that over a large number of cases, in-state hospitals will be paid an appropriate amount. Testimony of Gerard Anderson, Transcript at 314, lines 24–25.

*In–State Hospital Reimbursement of Direct Medical Education Costs*

102. In addition to reimbursement of the inpatient operating costs for each inpatient case, MAP pays in-state hospitals an additional amount to reimburse them for their direct education medical costs, if any. Facts 101.

103. MAP reimburses in-state hospitals for their direct medical education (DME) costs in accordance with the federal medicare regulations and applicable state laws and regulations for such reimbursement. *See* Testimony of David Feinberg, May 4,

5, and 6, 1988 Transcript at 95, lines 3–8, 19–24; 96, lines 1–3.

104. In developing its payment system, MAP recognized that organized or planned educational activities enhance the quality of care in an institution. Plaintiff's Exhibit 8. Testimony of Gerard Anderson, Transcript at 320, lines 12–23.

105. In developing its payment system, MAP stated it wanted to fairly reimburse the legitimate costs of DME. Plaintiff's Exhibit 8.

106. The defendants concluded that reimbursement of DME costs satisfied the OBRA standard. Facts 145.

107. A hospital's direct medical education costs are largely the salaries hospitals pay to residents in approved teaching programs. Testimony of Michael Maher, Transcript at 642, lines 16–23.

108. Residents spend approximately 75% of their time providing direct patient care. Testimony of Gerard Anderson, Transcript at 321, lines 17–21.

109. MAP reimburses in-state hospitals for the MAP share of their DME costs on a "pass through" basis subject to certain limitations. Testimony of Thomas Manak, Transcript at 227, lines 14–25; 228, lines 1–2.

110. MAP has a specific line on its medicaid cost report for hospitals to report their DME costs. Testimony of Michael Maher, Transcript at 648, lines 6–12.

111. MAP reimbursed in-state hospitals for the MAP share of their DME costs in 1984–1985 and 1985–1986 on an actual cost basis subject to certain limitations. *See* 55 Pa.Code § 1163.55. Defendants' Exhibit 2.

112. For fiscal year 1986–1987 and thereafter, MAP limits reimbursement to in-state hospitals for DME costs to 1.95% over the amount paid to the hospital in the previous year for DME costs or the hospital's allowable DME costs, whichever is less. *See* 55 Pa.Code 1163.55(d). Defendants' Exhibit 4.

113. In actual practice, MAP requires hospitals to claim resident salaries as part of the hospitals' cost of doing business.

MAP does not give residents in approved training programs separate provider contracts. Testimony of Michael Maher, Transcript at 649, lines 19–25; 650, lines 1–18.

114. There is no provision of the Pennsylvania State Plan or other Pennsylvania rule that would permit interns and residents in approved teaching programs to bill MAP directly for their services instead of having hospitals claim their salaries as costs. Testimony of David Feinberg, May 4, 5 and 6, 1988 Transcript at 106, lines 23–25; 107, lines 1–5; 121, lines 1–16.

*In–State Hospital Reimbursement of Capital Costs*

115. In addition to reimbursement of the inpatient operating costs for each inpatient case and in addition to any payments for direct medical education costs, MAP reimburses in-state hospitals for their allowable capital costs. Facts 103.

116. For the period July 1, 1984 through June 30, 1986 this reimbursement for capital costs was determined for each in-state hospital by ascertaining each hospital's specific capital costs. Facts 104.

117. MAP then paid its share of the hospital's actual allowable costs on a pass-through basis. Testimony of Thomas Manak, Transcript at 227, lines 1–12.

118. For the period July 1, 1984 through June 30, 1986, the defendants found that the reimbursement of an in-state hospital's actual, allowable capital costs satisfied the OBRA standard. Facts 137.

119. After July 1, 1986, MAP initiated a prospective payment system for reimbursement of an in-state hospital's capital costs. The system will be phased in between July 1, 1986 and June 30, 1992. During this period, MAP will pay in-state hospitals for their actual capital costs on a decreasing percentage basis. After July 1, 1992, MAP will reimburse all in-state hospitals the same flat rate for their capital costs. Testimony of David Feinberg, May 4, 5 and 6, 1988 Transcript at 64, lines 6–24; 65, line 1.

*The Phase-in of the Prospective Payment System for In–State Hospitals*

120. The defendants adopted a three year phase-in for Pennsylvania's prospective payment system for reimbursement of each in-state hospital's operating costs. The phase-in began in fiscal year 1984–1985. Facts 105.

121. The phase-in involved blending each in-state hospital's group average cost per case with the in-state hospital's hospital specific cost per case. Facts 106.

122. In fiscal year 1984–1985, an in-state hospital's prospective payment rate was a blend of 75% of the in-state hospital's hospital-specific cost per case, after a budget neutrality adjustment, and 25% of the hospital's group average cost per case, after a budget neutrality adjustment. Facts 107.

123. In fiscal year 1985–1986, an in-state hospital's prospective payment rate was calculated by adjusting the percentages from 75%/25% to 50%/50%. Facts 108.

124. In fiscal year 1986–1987, the prospective payment rate of an in-state hospital was determined by using only that in-state hospital's group average cost per case. Facts 109.

IV. The Pennsylvania Medicaid Program: Reimbursement of Out–of–State Hospitals

*General*

125. The Pennsylvania medicaid prospective payment system does not reimburse out-of-state hospitals the same way it reimburses in-state hospitals. Facts 117.

*Reimbursement for Operating Costs*

*Grouping*

126. Under the Pennsylvania prospective payment system all out-of-state hospitals are grouped together in one group—irrespective of the differences that might exist between the hospitals, such as teaching status, medicaid volume, environment, and hospital costs. Facts 118.

127. Out-of-state hospitals are grouped using one factor only: the hospitals are not located in Pennsylvania. Facts 119.

128. By grouping all out-of-state hospitals together Pennsylvania did not put out-of-state hospitals with the potential for similar costs together. December 28, 1987 Deposition of James Vertrees at 54, lines 13–18.

129. Defendants determined as early as September 6, 1983 that the Pennsylvania medicaid prospective payment system would classify all out-of-state hospitals into one group and reimburse them for operating costs using an average in-state rate based on the statewide average cost per case. Facts 120.

130. The drafters of the MAP prospective payment system were aware that placing all out-of-state hospitals together in a group and basing their payment on an average Pennsylvania statewide cost per case was potentially inequitable for a large university medical center because teaching hospitals have extremely high costs. December 28, 1987 Deposition of James Vertrees at 54, lines 13–22. Plaintiff's Exhibit 11.

*The Lack of a Factual Basis to Support the Payment Rate Used for WVUH*

131. No empirical study was done with respect to out-of-state payments between the period September 6, 1983 and July 1, 1984 when the prospective system was implemented. Facts 122.

132. To reimburse inpatient operating costs of out-of-state hospitals, Pennsylvania multiplies the relative value of the DRG assigned to the patient's illness by the out-of-state group rate (based on a Pennsylvania statewide average cost per case) or the hospital's actual charges for treating that illness, whichever is lower. *See* 55 Pa.Code § 1163.65(c).

133. In developing the reimbursement methodology for out-of-state hospitals, defendants did not look at the individual cost data for out-of-state hospitals. Facts 125.

134. Unlike the situation concerning in-state hospitals, the Pennsylvania medicaid payment rate for out-of-state hospitals has no relation to the actual costs incurred by the out-of-state hospitals in providing care to Pennsylvania medicaid recipients. Testi-

mony of Thomas Manak, Transcript at 229, lines 4–5, 18–25; 230, lines 1–2.

135. The Pennsylvania medicaid payment rate is not sensitive to differences that may exist between out-of-state hospitals. Testimony of Thomas Manak, Transcript at 228, lines 20–24.

136. A small community hospital that is out-of-state will receive the same MAP payment for a given DRG that WVUH will receive. Facts 129.

137. MAP has no empirical analysis that validates the payment rates for out-of-state hospitals. Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 111, lines 6–14, 24–25; 112, line 2.

138. MAP has no factual basis for concluding that its operating cost reimbursement to WVUH is adequate and reasonable. Testimony of Gerard Anderson, Transcript at 244, lines 8–25; 345, lines 1–3, 12–20.

139. MAP defends its payment rate for out-of-state hospitals on the grounds that it was administratively too burdensome to identify and validate the costs of out-of-state hospitals. December 15, 1987 Deposition of David Feinberg at 28, lines 9–11. Testimony of David Feinberg May 4, 5, and 6, 1988 Transcript at 43, lines 4–21.

140. Few out-of-state hospitals see more than 20 MAP cases per year. Plaintiff's Exhibit 56(A). Testimony of Thomas Manak, Transcript at 257, lines 11–24.

141. WVUH is the only out-of-state hospital that serves more than 160 MAP cases. Plaintiff's Exhibit 56(A).

142. MAP did not identify its large out-of-state providers. Testimony of James Vertrees, Transcript at 550, lines 2–25; 551, lines 1–18.

143. MAP considered out-of-state reimbursement a minor, technical issue, not a substantive issue. Testimony of Robert Gallagher, Transcript at 607, lines 1–6.

144. MAP presently has the audit capacity to verify the costs of 75–100 out-of-state hospitals. Testimony of Robert Gallagher, Transcript at 607, lines 1–6.

*MAP Did Not Consider Whether Out-of-State Hospitals Treat a Disproportionate Share of Low Income Persons*

145. It costs more to treat low income patients and hospitals that serve a large medicaid population are "particularly dependent" on medicaid reimbursement. 48 Fed.Reg. 56048 (December 19, 1983).

146. The Pennsylvania medicaid prospective payment methodology defines a low income patient as a patient who is a Pennsylvania medicaid recipient. Testimony of Gerard Anderson, Transcript at 359, lines 22–25; 360, lines 1–12.

147. MAP considers an in-state hospital that has an 18–20% medicaid volume serves a disproportionate number of low income patients. Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 109, lines 1–4.

148. The out-of-state reimbursement methodology does not contain any provision with which to identify out-of-state hospitals serving a disproportionate share of low income patients and by which to reimburse those hospitals any more than other out-of-state hospitals are reimbursed. Facts 133.

149. MAP does not take into account the high volume of medicaid patients at WVUH. Testimony of Gerard Anderson, Transcript at 424, lines 10–11.

150. Adequate medicaid reimbursement is essential for hospitals that have a high volume of medical assistance patients because their medicaid payment is significant in terms of their total revenue picture. December 28, 1988 Deposition of James Vertrees at 34, lines 7–14.

151. MAP concluded that the flat average rate paid to out-of-state hospitals, if used in-state, would result in teaching hospitals not getting enough payment and smaller community hospitals getting more than they needed. MAP did not have a similar concern for out-of-state hospitals. Testimony of James Vertrees, Transcript at 561, lines 7–25; 562, lines 1–21.

*Reimbursement of Capital Costs for Out-of-State Hospitals*

152. Under the Pennsylvania medicaid prospective payment system Pennsylvania does not reimburse WVUH or other out-of-state hospitals for their capital costs in the same manner as Pennsylvania reimburses in-state hospitals. Facts 125.

153. The Pennsylvania medicaid prospective payment system has never reimbursed out-of-state hospitals using their actual allowable costs of capital. Facts 139.

154. The Pennsylvania medicaid prospective payment system pays out-of-state hospitals an "add-on" for capital reimbursement that represents the average capital costs of all Pennsylvania hospitals. Facts 140.

155. The Pennsylvania "add-on" for capital costs to the reimbursement of out-of-state hospitals bears no relationship to the actual capital costs of those hospitals. Testimony of Thomas Manak, Transcript at 230, lines 7–15.

156. MAP gave in-state hospitals approximately 10 years to adjust to a flat rate payment for capital. Testimony of James Vertrees, May 6, 1988 Transcript at 78, lines 7–25; 79, line 1.

157. Out-of-state hospitals did not have a chance to adjust to a prospective payment for capital. Testimony of James Vertrees, May 6, 1988 Transcript at 79, lines 2–4.

158. Under the current Pennsylvania regulations that govern the medicaid prospective payment system, an out-of-state hospital that believes that the capital part of its payment is inadequate, cannot obtain more than the flat rate payment even if it can demonstrate that it has additional actual capital costs and that additional capital reimbursement is necessary to meet the costs of an efficiently and economically run institution. Deposition of David Feinberg at 164, lines 18–25.

159. Capital reimbursement is an important part of medicaid reimbursement because hospitals need to replace or expand their capital assets over time. Testimony of Gerard Anderson, Transcript at 364, lines 18–25; 365, lines 1–9.

160. WVUH's hospital facility has exhausted its useful life. Testimony of James Vertrees, Transcript at 552, lines 18–22.

161. When WVUH opens its new facility, WVUH will have no opportunity to obtain relief from MAP, under existing regulations, to cover what it believes is the MAP share of the additional capital costs associated with the new construction. Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 129, lines 6–25; 130, lines 1–7.

*Reimbursement of Direct Medical Education Costs of Out–of–State Hospitals*

162. Pennsylvania does not reimburse WVUH or any other out-of-state hospital for the costs of DME attributable to Pennsylvania medicaid recipients. Facts 146.

163. WVUH incurs DME costs because it is a teaching institution. Facts 147.

164. If the indirect costs of teaching hospitals were simply averaged with the costs of non-teaching hospitals, the former would not be adequately reimbursed for the extra costs empirically shown to be associated with their teaching function, as reflected in the issue paper dated October 12, 1984. Facts 151.

165. Based on Medicare results, the defendants acknowledge that a hospital with an intern and resident-per-bed ratio of 0.3 would be expected to have costs about 18% higher than otherwise similar hospitals with an intern and resident-per-bed ratio of 0.0, as reflected in the issue paper dated October 12, 1984. Facts 154.

166. Because it costs more for a teaching hospital to provide care, teaching hospitals would be adversely affected by receiving a uniform DRG payment. Testimony of Gerard Anderson, Transcript at 326, line 25; 327, lines 1–15.

167. As a general proposition, DME costs are legitimate and accepted costs of maintaining a medical school or a teaching hospital. Facts 156.

168. Failure of all payers to pay their share of DME costs would either jeopardize a teaching hospital's teaching program or require that the costs be borne by another source. Facts 157.

169. The MAP papers governing "Teaching Hospitals" and "Direct Medical Education" (Plaintiff's Exhibits 6 and 8), do not contain any rationale or basis-in-fact for the MAP decision not to reimburse the DME costs of out-of-state hospitals. Testimony of Gerard Anderson, Transcript at 331, lines 15–19.

170. Although MAP could have asked for and verified the DME costs for large out-of-state providers, it chose not to. Testimony of James Vertrees, May 4, 5, and 6, 1988 Transcript at 550, lines 12–15. Testimony of Robert Gallagher, Transcript at 605, lines 1–7.

171. MAP stated that it would not pay for educating physicians out-of-state. Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 57, lines 19–24.

172. MAP had no actual data as to the number of physicians who train at WVUH but practice in Pennsylvania. Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 57, line 25; 58, lines 1–4.

V. WVUH is the Largest Out–of–State Provider of Hospital Services to MAP Medicaid Recipients

173. The Hospital treated more Pennsylvania medicaid recipients than more than one half of the in-state hospitals for the period of July 1, 1985 through June 30, 1986. Facts 160.

174. WVUH provided more care to Pennsylvania medicaid residents than over one half of the in-state hospitals for fiscal year ending June 10, 1985 and fiscal year ending June 30, 1987. Plaintiff's Exhibit 51(A); Testimony of Thomas Manak, Transcript at 252, lines 3–7.

175. The Hospital treated more Pennsylvania medicaid recipients in fiscal year 1985–1986 than any other out-of-state hospital provider. Facts 161.

176. WVUH treated substantially more Pennsylvania medicaid recipients in fiscal year 1984–1985 and fiscal year 1986–1987 than any other out-of-state provider. Plaintiff's Exhibit 55.

177. In fiscal year 1985–1986, 163 out-of-state hospitals provided care to Pennsylvania medicaid recipients. Facts 162.

178. In both fiscal years 1984–1985 and 1985–1986, WVUH treated in excess of 800 Pennsylvania medicaid patient cases. In fiscal year 1986–1987, it treated approximately 730 Pennsylvania medicaid patient cases. The next largest out-of-state provider treated fewer than 160 Pennsylvania medicaid patients. Plaintiff's Exhibit 56.

179. For fiscal years 1984–1985, 1985–1986 and 1986–1987, most out-of-state hospital providers treated fewer than ten Pennsylvania medicaid cases. Plaintiff's Exhibit 56(A). Facts 170.

## VI. The Effect of MAP Payment to WVUH

180. Because WVUH treats so many MAP cases, inadequate MAP reimbursement will have substantial financial consequences for the Hospital and will jeopardize its continued ability to care for MAP patients. Testimony of Bernard Westfall, Transcript at 98, lines 2–22. December 28, 1987 Deposition of James Vertrees at 56, lines 4–8; 60, lines 5–22; 61, lines 1–15.

181. If WVUH withdraws from the Pennsylvania medicaid program, it will jeopardize some Pennsylvania medicaid recipients' access to needed health care services. Testimony of Bernard Westfall, Transcript at 96, lines 14–25; 97, lines 1–18; 98, lines 2–19.

182. The defendants' failure to reimburse the Hospital adequately will also curtail Pennsylvania medicaid recipients' freedom of choice if WVUH is compelled to withdraw from the Pennsylvania medicaid program.

183. On average, MAP reimburses in-state hospitals approximately 95% of the costs they incur in treating Pennsylvania medicaid recipients. In contrast, MAP reimburses WVUH for only approximately 54% of the costs it incurs in treating MAP patients. Testimony of Thomas Manak, Transcript at 663, lines 20–25; 664, lines 1–24.

184. MAP pays an in-state hospital $344.00 more to treat an average case than it pays WVUH to treat an average case. Testimony of Thomas Manak, Transcript at 244, lines 15–19.

185. MAP reimburses WVUH an increasingly lower proportion of WVUH's costs of caring for a Pennsylvania medicaid recipient. Testimony of Thomas Manak, Transcript at 246, lines 14–21. Plaintiffs' Exhibit 64.

## VII. The MAP Appeals System

186. Pursuant to requirements of federal regulation 42 C.F.R. section 446.253(c), the Pennsylvania medicaid agency must provide hospitals with a system by which to appeal. Facts 175.

187. The administrative agency division which adjudicates the appeals is the Department of Public Welfare's Office of Hearings and Appeals (OHA). Testimony of David Feinberg, May 4, 5, and 6, 1988 Transcript at 87, lines 8–10.

188. OHA employs hearing officers, some of them attorneys, to hear appeals, take testimony, admit exhibits, make findings of fact, and determine whether the Pennsylvania Medicaid Agency properly applied its regulations. Defendants' Exhibits 31, 32.

189. The hearing officer recommends a decision to the Director of OHA, who either adopts or rejects the recommendation. Defendants' Exhibit 7. (General Rules of Administrative Practice); 1 Pa.Code, Part II; 55 Pa.Code § 1101.

190. Both parties to the administrative appeal, the Office of Medical Assistance and the provider, have the right to request reconsideration from the Secretary should the other party prevail. *Id.;* 1 Pa.Code §§ 33.61, 35.187(8) and 35.190.

191. Outside of the administrative appeals process, review of the decision of the Director of OHA or the Secretary of DPW may be sought from the judiciary of the Commonwealth of Pennsylvania.

192. The Commonwealth Court is the judicial body in Pennsylvania that is statutorily charged with the duty to review administrative decisions.

193. The administrative hearing officer in the Pennsylvania appeals system would provide no relief to an out-of-state hospital

if the out-of-state hospital appealed on the grounds that it should be grouped as if it were an in-state hospital. Facts 177.

194. The administrative hearing officer in the Pennsylvania appeals system would provide no relief to an out-of-state hospital that appeals on the grounds that it should be reimbursed for the Pennsylvania medicaid share of its direct medical education costs. Facts 178.

195. The administrative hearing officer in the Pennsylvania appeals system would provide no relief for an out-of-state hospital that appeals on the grounds that it should be reimbursed as an in-state hospital for its specific capital costs. Facts 179.

196. The administrative hearing officer in the Pennsylvania appeals system would provide no relief for an out-of-state hospital seeking inclusion of its hospital specific costs during the phase-in of Pennsylvania's prospective payment system as was the case for in-state hospitals. Facts 180.

197. If an out-of-state hospital were to appeal the adequacy of its rate and if the defendants had correctly applied the reimbursement methodology, i.e., the hospital were properly grouped with all other out-of-state hospitals, the hospital received the correct payment for the out-of-state group, and there were no error in the calculations, that out-of-state hospital would not prevail in an administrative appeal before an administrative hearing officer in the Pennsylvania appeals system. Facts 181.

198. No provision of law, including regulations, provides any authority or criteria that governs the Secretary of Public Welfare's grant or denial of relief to a hospital upon the Secretary's reconsideration of an adverse administrative appeals decision. Defendants' Exhibits 2, 3, 4, 5, 15.

VIII. MAP's Findings and Assurances to the Health Care Financing Administration

199. None of the findings and assurances MAP submitted to the Secretary of Health and Human Services (HHS) concerning the Pennsylvania prospective payment system for inpatient care directly refers or is applicable to out-of-state hospitals. Defendants' Exhibit 15.

200. Defendants made no assurances to HHS specifically related to the adequacy of MAP reimbursement to out-of-state hospitals. Testimony of Peter Goodman, Transcript at 525, lines 20–25.

201. The Health Care Financing Administration did not "look behind" MAP's assurances concerning the adequacy of its reimbursement rates, including its payment rates to out-of-state hospitals, nor did it require Pennsylvania to set forth the Commonwealth's specific findings concerning the adequacy of those rates. Testimony of Peter Goodman, Transcript at 531, line 25; 532, lines 1–7.

*Discussion*

*Jurisdiction*

■ Defendants challenge plaintiff's standing to bring this action. In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court stated:

In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential considerations on its exercise.... In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III.... A federal court's jurisdiction ... can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action....' [The prudential considerations involve] limits on the class of persons who may invoke the court's decisional and remedial powers.

*Id.* at 498–99, 95 S.Ct. at 2204–05 (citations omitted). In order for a plaintiff to satisfy prudential considerations, he or she generally must be asserting his or her own legal rights and interests, not the rights or interests of third parties. *Id.* at 499, 95 S.Ct. at 2205. Furthermore, a plaintiff's injury

must be somewhat individualized. "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Id.*

With regard to the constitutional requirements for standing, defendants' only "argument" is as follows: "[N]othing requires plaintiff to participate in the program. It has no real injury and Article III's requirements have not been met." Defendants' Post–Trial Memorandum at 62. To its credit, WVUH does not respond to this argument. With regard to the prudential considerations, defendants argue that plaintiff, as a provider of medical services, does not have interests within the zones protected by the sections of Title XIX on coverage and protection afforded recipients, neither are plaintiff's interests within the zone protected by the section of Title XIX on payment for hospital services.

The "zone-of-interests" test refers to "the question whether the interest sought to be protected by the complaint is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970).

■ The primary beneficiaries of Title XIX are recipients of health care services. However, providers "can properly seek to enforce the reimbursement standards of the Medicaid statute both in their own right and as representatives of Medicaid recipients." *Wilmac Corp. v. Heckler,* 633 F.Supp. 1000, 1006 (E.D.Pa.1986), *vacated on other grounds,* 811 F.2d 809 (3d Cir. 1987). Because WVUH seeks to enforce the federal standards on reimbursement, it has standing to assert claims under Title XIX. *See, e.g., Washington State Health Facilities Ass'n v. State of Washington Dept. of Social and Health Services,* 698 F.2d 964 (9th Cir.1982) (providers successfully sought injunction to prevent state from enforcing a regulation which deviated from the federally approved state medicaid plan by altering the method of reimbursing

nursing care facilities without receiving federal approval); *Edgewater Nursing Center, Inc. v. Miller,* 678 F.2d 716 (7th Cir.1982) (nursing home owners unsuccessfully challenged the validity of the cutoff date for determining the year of construction or latest acquisition in Illinois' method of reimbursing capital costs); *Troutman v. Cohen,* 588 F.Supp. 590 (E.D.Pa.1984), *aff'd without opinion,* 755 F.2d 924 (3d Cir.1984) (providers unsuccessfully sought injunction against implementation of Pennsylvania's reimbursement regulations).

■ Defendants also contend the Hospital does not have a cause of action under 42 U.S.C. section 1983 to assert defendants' violations of the Social Security Act. As plaintiff points out, defendants do not challenge the court's jurisdiction to hear a challenge to the state's compliance with federal law; the court has jurisdiction to hear such challenges pursuant to 28 U.S.C. section 1331. Rather, defendants raise a question as to whether the remedy of a section 1983 cause of action is available. 42 U.S.C. section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In 1980, the Supreme Court, rejecting an argument that the phrase "and laws" should be read as limited to civil rights or equal protection laws, stated unequivocally:

> [T]he plain language of the statute [42 U.S.C. § 1983] undoubtedly embraces respondents' claim that petitioner violated the Social Security Act.

> Even were the language ambiguous, however, any doubt as to its meaning has been resolved by our several cases suggesting, explicitly or implicitly, that the § 1983 remedy broadly encompasses violations of federal statutory as well as

constitutional law. *Rosado v. Wyman*, 397 U.S. 397 [90 S.Ct. 1207, 25 L.Ed.2d 442] (1970), for example, 'held that suits in federal court under § 1983 are proper to secure compliance with provisions of the Social Security Act on the part of participating States.' *Edelman v. Jordan*, 415 U.S. 651, 675 [94 S.Ct. 1347, 1361–62, 39 L.Ed.2d 662] (1974). *Maine v. Thiboutot*, 448 U.S. 1, 4 [100 S.Ct. 2502, 2504, 65 L.Ed.2d 555] (1980).

The *Thiboutot* Court also discussed the propriety of invoking pendent jurisdiction to decide the Title XIX challenges where constitutional challenges were raised as well. In those cases (cited at 6, 100 S.Ct. at 2505 in the *Thiboutot* opinion) "[section] 1983 was necessarily the exclusive statutory cause of action...." *Id.* at 6, 100 S.Ct. at 2505. In the case at bar, this court exercises federal question jurisdiction on plaintiff's Fourteenth Amendment challenge of equal protection and can invoke pendent jurisdiction if it so chooses. However, this court is satisfied a Social Security Act cause of action lies under section 1983 whether or not a constitutional challenge exists. The court finds it has jurisdiction to adjudicate this action.

*Compliance With Federal Law*

■ The central question in this action is whether defendants satisfy the federal law requirements set forth in 42 U.S.C. section 1396a(a)(13)(A) in reimbursing WVUH for inpatient hospital services provided to Pennsylvania medicaid recipients. Although the court's standard of review of nonadjudicatory agency action is confined to a determination of whether the action is arbitrary or capricious, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Colorado Health Care Ass'n v. Colorado Dept. of Social Services*, 842 F.2d 1158 (10th Cir.1988), "[a] district court can, of course, decide whether federal law has been violated." *Mississippi Hosp. Ass'n. v. Heckler*, 701 F.2d 511, 516 (5th Cir.1983). "So long as the specific requirements of the law are met, the Court must defer to the agency's exercise of discretion unless it acts arbitrarily or capriciously."

*Mary Washington Hosp., Inc. v. Fisher*, 635 F.Supp. 891, 896 (E.D.Va.1985).

The federal law at issue here, 42 U.S.C. section 1396a(a)(13)(A), known as the Boren Amendment, is part of the Omnibus Budget Reconciliation Act of 1981 (OBRA). Congress' purposes in passing the Boren Amendment were two-fold: "first, that the states set their own reimbursement rates without stifling and expensive federal oversight of the methodology used; and, second that Medicaid expenses be reduced by allowing the states to develop payment systems which would encourage efficiency." *Colorado Health Care Ass'n*, 842 F.2d at 1165. The Boren Amendment provides in pertinent part:

A State plan for medical assistance must— ... provide— ... for payment ... of the hospital, skilled nursing facility, and intermediate care facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State) and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs and provide, in the case of hospital patients receiving services at an inappropriate level of care ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital, skilled nursing facility, and intermediate care facility and periodic audits by the State of such reports; ....

42 U.S.C. § 1396a(a)(13)(A).

The Health Care Financing Administration (HCFA) charged with the responsibili-

ty for administering the Medicare and Medicaid programs, published regulations implementing the Boren Amendment on September 30, 1981. 42 C.F.R. §§ 447.250–447.280. In pertinent part, the regulations require states which participate in the Medicaid program to make findings and submit assurances to HCFA (*id.* at § 447.253(a)(b)) that their inpatient hospital service payment rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities...." *Id.* at § 447.250(a). Furthermore, states must, in setting their reimbursement rates, "take into account the situation of hospitals which serve a disproportionate number of low income patients...." *Id.* at § 447.253(b)(1)(ii)(A).

It is plaintiff's contention the defendants have not complied with the Boren Amendment or its implementing regulations. WVUH is challenging the legality of Pennsylvania's overall payment system, based upon statutory requirements and upon Pennsylvania's own definition of what should be included in a reasonable rate. One part of the challenge involves the issue of the number and type of low income patients WVUH serves. Approximately thirty-eight percent (38%) of all WVUH admissions are low income persons. This figure includes charity patients, bad debts, and medicaid recipients. Approximately twenty-three percent (23%) of the 38% are medicaid recipients. Out of that 23%, seventeen percent (17%) are West Virginia medicaid recipients and five percent (5%) are Pennsylvania medicaid recipients. The court finds WVUH serves a disproportionate number of low income patients. The statute and implementing regulations are plain and clear in their requirement that states, when setting rates, take into consideration whether a hospital serves a "disproportionate number of low income patients with special needs." *Id.* Thus, the law provides any reimbursement rate for WVUH must reflect that fact.

When Pennsylvania set its DRG reimbursement rates for out-of-state hospitals, it did not consider whether a hospital served a disproportionate number of low income persons. It merely determined the average DRG reimbursement rate for in-state hospitals and applied that figure across the board to out-of-state hospitals. As an out-of-state hospital, WVUH's low income-patient-factor was not considered by DPW when it set the Hospital's rate. WVUH contends Pennsylvania violated federal law because it did not consider the Hospital's low-income-patient-factor.

The defendants argue they are in compliance with federal law because according to their calculations WVUH does not serve a disproportionately high number of low income patients and therefore that factor did not have to be considered in setting the Hospital's rate. The reason the defendants do not consider WVUH as a hospital with a high low-income-patient factor is because DPW considered only *Pennsylvania* medicaid recipients in its definition of low income patients. Pennsylvania uses Pennsylvania medicaid volume as a proxy for low income population. While consideration of only Pennsylvania medicaid recipients may be valid for in-state hospital rate setting, (that question is not before the court), it is not valid for out-of-state hospital rate setting. Congress recognized a hospital's costs would be proportionately elevated commensurate with its low income patient population. Members of the Congressional conference on the Boren Amendment "recognize[d] that public hospitals and teaching hospitals which serve a large Medicaid and low income population are particularly dependent on Medicaid reimbursement, and ... [they were] concerned that a State take into account the special situation that exists in these institutions in developing their rates." H.R.Conf.Rep. No. 97–208, 97th Cong., 1st Sess. 962, *reprinted in* 1981 U.S.Code Cong. & Admin. News 396, 1010, 1324. Apparently Congress did not intend to distinguish between in-state or out-of-state medicaid patients. Furthermore, low income patients other than medicaid recipients were intended to be included in a state's consideration as well.

A medicaid patient from West Virginia drives up the cost of services the same as a medicaid patient from Pennsylvania. If

Pennsylvania's formula for complying with federal law were accepted, it is quite possible a hospital with highly disproportionate numbers of low income patients could be reimbursed at outrageously low rates. A hypothetical situation drafted by plaintiff vividly illustrates the deficiency of Pennsylvania's formula:

[A]ssume the following:

1. A hospital is located where three states converge;

2. The hospital takes ⅓ of its patients from each state;

3. A medicaid volume of 24% is presumed by each state to be indicative of a disproportionate share provider;

4. The hospital has a medicaid volume of 30%, and those medicaid patients come equally from each of the three states (i.e., ⅓ × 30% = 10%).

Under these facts, the hospital is a disproportionate share provider, but if each state were to group the hospital, counting only its 10% share of medicaid patients, the hospital would never receive the more favorable reimbursement treatment Congress intended.

Plaintiff's Post–Trial Reply Memorandum at 28–29.

 In order for Pennsylvania to comply with federal law on adequately and reasonably compensating hospitals which serve a disproportionate number of low income patients, it must consider more than Pennsylvania medicaid recipients only. Therefore, the fact that only 5% of WVUH's low income population are Pennsylvania medicaid recipients does not disqualify WVUH from consideration as a disproportionate share provider under federal law. The court finds because defendants did not take the WVUH's situation vis a vis low income patients into consideration in setting the Hospital's rates, they have violated 42 U.S.C. section 1396a(a)(13)(A) and its implementing regulations 42 C.F.R. sections 447.250–447.280.

Defendants also argue they are in compliance with federal law despite not having considered out-of-state hospitals' situations vis a vis low income patients because the federal government approved its plan.

DPW submitted assurances to HCFA that its methodology and program met the requirements of the Boren Amendment. The assurances did not include anything regarding out-of-state hospitals specifically. The assurances were based on information requested from and submitted by in-state hospitals. For instance, one part of the assurances states: "The Department also used all hospitals' most recently filed cost reports for the Medical Assistance Program and the hospitals' last audited per diem rates." Defendants' Exhibit 13. In fact, no cost reports or audited per diem rates were requested from or received from out-of-state hospitals. The assurances read as if *all* hospitals' individual situations and characteristics were considered by DPW. However, the assurances were based on findings regarding in-state hospitals only. In approving DPW's program, which included the plan for reimbursing out-of-state hospitals, HCFA did not "look behind" the submitted assurances. In other words, the federal government took at face value DPW's assurances that it made findings that its payment rates "are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities ... [and that DPW took] into account the situation of hospitals which serve a disproportionate number if low income patients...." 42 C.F.R. §§ 447.150, 447.-253(b)(1)(ii)(A).

Defendants argue HCFA's approval of DPW's program demonstrates its validity. However, HCFA admits it did not examine DPW's assurances for accuracy or truthfulness or for anything. It merely accepted DPW's statements at face value. This in and of itself would not necessarily undermine DPW's assertion that government approval demonstrates validity, but the fact that the assurances are based only on in-state hospitals does lessen considerably any "weight that HCFA's resultant approval of the plan might otherwise have carried with the Court." *Mary Washington Hosp.*, 635 F.Supp. at 898; *see Aitchison v. Berger*, 404 F.Supp. 1137, 1148 (S.D.N.Y. 1975), *aff'd without opinion*, 538 F.2d 307

(2d Cir.1976), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). In fact, the assurances are not based on findings that the plan comports with the statute's requirement of reasonable and adequate compensation and on findings that the plan comports with the statute's requirement that a hospital's low income-patient-factor be taken into consideration. The court finds because DPW did not comply with the Boren Amendment's implementing regulations, government approval of its plan does not demonstrate the plan's validity.

Another aspect of Pennsylvania's program with which plaintiff takes issue is the system for reimbursement of capital costs. From July 1, 1984 to June 30, 1986, Pennsylvania reimbursed in-state hospitals for the medicaid share of their allowable capital costs. On July 1, 1986, Pennsylvania began a seven year phase-in of a prospective payment system for capital cost reimbursements for in-state hospitals. For out-of-state hospitals, Pennsylvania has reimbursed a fixed amount to cover costs regardless of the actual costs incurred. Pennsylvania has not provided a phase-in period for out-of-state hospitals.

Pennsylvania uses fiscal year 1985 as its base year for the capital reimbursement system. As of the time of trial, WVUH was expected to open its new replacement hospital during 1988. As a result of the opening of the new facility, WVUH will experience a marked increase in its capital costs. Pennsylvania's regulations do not provide an exception to hospitals which replace their facilities, whether they are in or out-of-state hospitals. The base year will be applied to WVUH despite WVUH's recognized need to replace its facility.

In addition to its objections to Pennsylvania's system for capital cost reimbursement and operating cost reimbursement, plaintiff objects to Pennsylvania's decision not to reimburse out-of-state hospitals for their direct medical education (DME) costs. Pennsylvania does not reimburse out-of-state hospitals for any of their DME costs. Largely it is interns' and residents' salaries which account for the bulk of a hospital's DME costs. Residents spend approximately seventy-five percent (75%) of their time administering patient care. Therefore, a reimbursement of DME costs is, in effect, largely a reimbursement for patient care.

Teaching hospitals are virtually always more expensive per DRG than non-teaching hospitals. Pennsylvania recognizes an adjustment in reimbursement is necessary to compensate teaching hospitals for their higher indirect patient care costs. Pennsylvania acknowledges if a teaching hospital did not receive compensation for its DME costs, it could cause serious financial difficulties for the institution. If one payer does not bear its share of DME costs, either other payers will be unfairly burdened with picking up the difference or the existence of the teaching programs could be jeopardized. Concomitant with the increased indirect costs of patient care at a teaching hospital, is the increased quality of care the patients receive. Pennsylvania medicaid recipients get the benefit of this higher quality care but WVUH is not compensated by Pennsylvania for giving it. WVUH asserts Pennsylvania is violating its own definition of adequate and reasonable reimbursement under the OBRA standard. Because Pennsylvania recognizes that its payment of DME costs to its in-state hospitals satisfies the OBRA standards, WVUH argues, that by not making those payments to similarly situated out-of-state hospitals, Pennsylvania is not satisfying the OBRA standards.

The reason defendants offer for not reimbursing out-of-state hospitals is they do not wish to finance the training of non-Pennsylvania physicians. However, not all WVUH residents practice in West Virginia. Approximately seven percent (7%) of them practice in Pennsylvania. Also, not all residents trained in Pennsylvania will practice there. Thus, Pennsylvania does help finance the training of non-Pennsylvania physicians. In addition to Pennsylvania medicaid recipients receiving the benefits of a higher quality of care, and in addition to Pennsylvania benefitting from having some of its physicians trained at WVUH, Pennsylvania doctors also benefit from WVUH's teaching status by using the Hos-

pital's resources and expertise through the Medical Access Referral System.

### Reasonableness and Adequacy

Although plaintiff attacks the validity of each of the components of defendants' out-of-state reimbursement system, it is the validity of the system as a whole and the resultant total rate of reimbursement which is important. *E.g., Colorado Health Care Ass'n v. Colorado Dept. of Social Services,* 842 F.2d 1158, 1167 (10th Cir. 1988). For instance, it is not controlling whether Pennsylvania provides a phase-in period on capital costs reimbursement or whether it engaged in a grouping analysis for out-of-state hospitals. In the *Colorado Health Care Ass'n* case, the court considered a challenge to the Colorado Department of Social Services' decision to suspend an incentive payment available in the state's reimbursement system. The challengers argued dropping the incentive payment violated the Boren Amendment. The court disagreed.

> It is the resulting overall payment which is evalutated for statutory compliance. *See Wisconsin v. Reivitz,* 733 F.2d 1226, 1233 (7th Cir.1984) (price medicaid reimbursement rate is not, per se, the only reasonable and adequate rate); *accord Illinois Council on Long Term Care v. Miller,* 579 F.Supp. 1140, 1147 (N.D.E.D. Ill.1983). Reasonableness has been characterized as a zone, not a pinpoint.

*Id.*

The zone of reasonableness has been construed "as a zone or range in which a State may consider the relevant factors and data and determine a valid reimbursement which is reasonable and adequate. The state must articulate a 'rational connection between the facts found and the choice made.'" *Colorado Health Care Ass'n,* 842 F.2d at 1167 (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)).

To determine its methodology and rate reimbursement to in-state hospitals, Pennsylvania requested and received a very large amount of information from those hospitals. Pennsylvania confirmed the information, broke it down, studied it, massaged it, and used it to create a detailed, sophisticated methodology of reimbursement. The purpose behind the methodology was to create a system which would be responsive to the situational realities of the in-state hospitals, while keeping within conservative budgetary limits. Achieving this purpose would satisfy the goal of the Boren Amendment "that medicaid expenses be reduced by allowing the states to develop payment systems which would encourage efficiency." *Colorado Health Care Ass'n,* 842 F.2d at 1165. Furthermore, achieving this purpose would also satisfy the statutory and regulatory requirements of the Boren Amendment by reimbursing hospitals reasonably and adequately for their costs in treating medicaid patients.

Pennsylvania's approach to developing a methodology for out-of-state hospitals contrasts sharply with its approach to developing one for in-state hospitals. It admits it did not in any way whatsoever attempt to design a methodology which would be even remotely related to the situational realities of out-of-state hospitals. For operating costs reimbursements, Pennsylvania took the average payment to in-state hospitals and blindly applied it to each out-of-state hospital. For capital costs reimbursements, Pennsylvania determined a base year and a flat rate and blindly applied it to each out-of-state hospital. For direct medical education costs reimbursement, Pennsylvania cut-out payment altogether.

In addition, as has been discussed at length, *supra,* defendants have not complied with the statute's directive to consider the low income patient status of the Hospital, nor has Pennsylvania complied with the implementing regulations' requirement that the assurances made to HCFA be based on findings that a payment is adequate and reasonable. The defendants did not base their decisions on anything pertinent regarding the out-of-state hospitals themselves.

■ Defendants allege administrative resource and self-imposed time constraints dictated their handling of out-of-state hospitals. The court is not insensitive to the

state's budgetary limitations. Here, budgetary limitations meant only a certain number of people were available to work on developing the prospective payment system. These budgetary and resultant personnel constraints can be considered by the state as a factor in developing the system, "so long as the result complies with the federal requirements for a reasonable and adequate payment." *Colorado Health Care Ass'n,* 842 F.2d at 1168. In short, budgetary constraints will not excuse a state's failure to comply with federal law. *Wisconsin Hospital Ass'n v. Reivitz,* 733 F.2d 1226, 1236 (7th Cir.1984); *Friedman v. Perales,* 668 F.Supp. 216, 221 (S.D.N.Y. 1987), *aff'd,* 841 F.2d 47 (2d Cir.1988). The defendants admit they did not treat the issue of out-of-state hospital methodology and reimbursement as a substantive issue. It was for them merely a technical issue.

■ It is certain defendants did not base their decisions on out-of-state hospitals on any relevant data. They did not attempt to test their decision against the requirements of the federal law. In essence, they assumed, without any basis-in-fact, their decision was valid under the federal law. The court finds, "[s]uch intuitional forms of decision making, completely opaque to judicial review, fall somewhere on the distant side of arbitrary." *Central Florida Enterprises, Inc. v. Federal Communications Comm'n,* 598 F.2d 37, 50 (D.C.Cir. 1978), *cert. denied,* 460 U.S. 1084, 103 S.Ct. 1774, 76 L.Ed.2d 346 (1983). The state has failed to articulate a rational connection, or *any* connection, between the situational realities of out-of-state hospitals and the decision to reimburse them as it chose. Therefore, the court finds the decision made by Pennsylvania on how to reimburse out-of-state hospitals and at what rate was arbitrary and capricious. In its totality, Pennsylvania's prospective payment system for out-of-state hospitals violates federal law. The payments to WVUH are not reasonable and adequate: the payments do not reflect WVUH's high low income patient population; the payments do not compensate WVUH for Pennsylvania medicaid's share of the Hospital's DME costs; the payments will not fairly cover Pennsylvania's medicaid share of WVUH's capital costs; and the DRG payment rate is insufficient to meet the operating costs incurred by this "efficiently and economically operated" facility.[2]

WVUH is being harmed by receiving less than adequate payment from Pennsylvania. Had the Hospital been treated as a similarly situated hospital in Pennsylvania, and had the defendants complied with federal law regarding consideration of a hospital's low income patient population, WVUH would have received approximately $2.3 million more from Pennsylvania than it has received under the prospective payment system. On average, an in-state hospital is reimbursed for approximately 95% of its costs in treating a Pennsylvania medicaid recipient. WVUH is reimbursed for approximately 54% of its costs in treating a Pennsylvania medicaid recipient. Either in-state hospitals are receiving a huge windfall, or WVUH is receiving far less than it is entitled to under the federal law.

As noted in the findings of facts, the prospective payment system which is a DRG payment-based system creates cases which are "winners" and "losers." A "winner" is a case for which a hospital is paid more than what its charges are in that case. A "loser" is a case for which a hospital is paid less than what its charges are in that case. The prospective payment system was designed to balance the incidents of winners and losers to ensure no hospital is over or under compensated in the long-run. That is how it works for in-state hospitals. It does not work that way for out-of-state hospitals. Out-of-state hospitals never get winners. This is because they are paid either the DRG payment or their actual charges—whichever is *less.* Without a balance of winners and losers, a hospital will surely be underpaid in the long-run.

---

**2.** It should be noted defendants have not alleged WVUH is not an "efficiently and economically operated" facility.

WVUH is being harmed by its treatment under Pennsylvania's payment system. The inadequacy of reimbursement raises serious questions about WVUH's ability to provide care to Pennsylvania medicaid recipients. The Hospital cannot continue indefinitely to sustain the losses imposed on it under the current reimbursement system. The defendants' own expert testified that although a prospective payment system which relied exclusively on a statewide average may be a desirable ultimate goal, imposing such a system suddenly, would be "dangerous." He testified "[i]t would bankrupt them [the hospitals] potentially.... [T]he teaching hospitals in particular have extremely high costs." Vertrees Deposition at 40, lines 13–15. WVUH cannot continue indefinitely to provide the level of services and care it now provides to Pennsylvania medicaid recipients if it continues to receive inadequate and unreasonable reimbursement from Pennsylvania. Testimony of Bernard Westfall, Transcript at 96–98.

WVUH is by far Pennsylvania's most important out-of-state provider. Although it may only account for one percent (1%) of Pennsylvania's provider budget, it treats more Pennsylvania medicaid recipients than half the hospitals in Pennsylvania. Forcing the Hospital to limit or compromise the quality of care or services it provides to Pennsylvania medicaid recipients is in contravention of the Boren Amendment. The "ultimate touchstone" of the Boren Amendment is whether

> a reimbursement policy will alter the availability of or quality of care to be provided.... 46 Fed.Reg. 47970; *see Mary Washington Hospital, Inc. v. Fisher,* ... 635 F.Supp. at 901–904 (Congress added reasonable access constraint to prevent states from lowering reimbursement rates so much that a dangerous number of hospitals might withdraw from the program).

*Friedman v. Perales,* 668 F.Supp. at 225. The reimbursement system, if not altered, will ultimately have a measurable negative impact on Pennsylvania medicaid recipients because their ready access to quality care will be impaired. This is another reason why the overall system for out-of-state hospitals is violative of the federal law.

### Fourteenth Amendment

██ Another question before the court is whether Pennsylvania's disparate treatment constitutes unconstitutional discrimination in violation of WVUH's equal protection rights under the Fourteenth Amendment. The state has developed a payment methodology in which it classifies hospitals and bases reimbursements on hospitals' classifications. The method used by the state has resulted in plaintiff being placed in a class in which it receives a considerably lower reimbursement than other hospitals similarly situated but within Pennsylvania's borders.

The court applies a "traditional" equal protection analysis because suspect classifications such as race, religion or national origin are not involved here. "Under 'traditional' equal protection analysis, a legislative classification must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate governmental interest." *Frontiero v. Richardson,* 411 U.S. 677, 683, 93 S.Ct. 1764, 1768–69, 36 L.Ed.2d 583 (1973) (citing *Jefferson v. Hackney,* 406 U.S. 535, 546, 92 S.Ct. at 1724, 1731, 32 L.Ed.2d 285 (1972)); *Richardson v. Belcher,* 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971); *Flemming v. Nestor,* 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960); *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970). Whether defendants' classifications are unconstitutional turns on the question of reasonableness.

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequity.'

*Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161–62 (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)).

In cases involving economics and social welfare wherein classifications and resultant "imbalanced" treatment occur, the United States Supreme Court looks for links between legitimate governmental interests and the classifications. *E.g. Dandridge v. Williams, supra* (State regulation placing a maximum ceiling on benefits in the Aid to Families with Dependent Children (AFDC) program was challenged unsuccessfully by large family recipients. Court found the regulation free from invidious discrimination and found it rationally related to the "State's legitimate interest in encouraging employment and in avoiding discrimination between welfare families and the families of working poor." *Id.* at 486, 90 S.Ct. at 1162); *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (State's decision to provide somewhat lower welfare benefits to AFDC recipients than to the aged and infirm was not invidious or irrational because it is not unreasonable for a state to conclude "that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living.... [I]t is not irrational for the State to believe that the young are more adaptable than the sick and elderly...." *Id.* at 549, 92 S.Ct. at 1733); *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971) (Recipient of federal disability benefits challenged classification wherein his benefits were reduced as a result of his receipt of state workmen's compensation benefits. The Court found Congress' goals of encouraging able workers to return to work and forestalling the erosion of workmen's compensation programs were legitimate, and the challenged classification was rationally related to the achievement of those goals.)

In the case at bar, defendants have not clearly articulated just what their interests are. This makes the task of evaluating the legitimacy of the state's interests difficult. Further, defendants have not coherently argued the link between the classifications of in-state versus out-of-state and the achievement of state interests (whatever they may be). Rather, they defend their decision by pointing out perceived differences in the classes and the administrative difficulties they would experience if out-of-state hospitals were classified under the in-state hospital grouping system and paid under the in-state hospital methodology.

Defendants argue it is reasonable to classify out-of-state hospitals differently based on that characteristic of being an out-of-state hospital alone because: "they are eligible for payment only in limited circumstances (42 C.F.R. § 431.52(b)), provide services infrequently, do not file cost reports, are administered by other states, are often not enrolled as providers until after services are rendered, and are not subject to the same documentation and auditing requirements as in-state providers." Defendants' Post–Trial Memorandum at 32. None of defendants' proferred reasons provides a rational basis for the state's discriminatory practice.

Defendants' assertion 42 C.F.R. section 431.52 provides a basis for treating out-of-state hospitals differently is not supported. The regulation is not directed towards the treatment of hospitals but towards the treatment of medicaid recipients. The regulation merely enumerates the instances and circumstances under which Pennsylvania residents may receive medicaid benefits when the residents are absent from the state. The argument on out-of-state hospitals providing services infrequently is based on an inaccurate analysis. While the statement may be true for some, or even many out-of-state hospitals, it is not at all true for WVUH. As noted previously, plaintiff treats more Pennsylvania medicaid recipients than half of Pennsylvania's hospitals. As to out-of-state hospitals not filing cost reports, defendants do not request cost reports. There is nothing in the record to suggest plaintiff and other out-of-state hospitals would not file cost-reports if requested by defendants. Next, the fact that out-of-state hospitals are administered by other states does not explain why they should receive different reimbursement

rates or be treated differently as to DME costs or capital costs. That out-of-state hospitals are often not enrolled as providers until after services are rendered does not explain why those hospitals which *are* enrolled receive disparate treatment. Finally, defendants' asserted rationale that disparate treatment is warranted because out-of-state hospitals are not subject to the same documentation and auditing requirements fails to provide a link because, again, there is nothing in the record to suggest out-of-state providers would not supply appropriate documentation, if asked to do so, and would not subject themselves to audits, if asked to do so. Indeed, Pennsylvania could audit 75–100 more hospitals each year without increasing its audit staff.

After listing their "justifications" for the disparate treatment, the defendants offer what appear to be interests. They state:

> DPW reasonably determine [sic] that certain incentives for growth, quality of care, and availability, e.g., special payments for medical education costs, were not warranted for out-of-state facilities because the return on such incentive payments was not as significant as from such payments to in-state hospitals.[3]

There is no evidence in the record to support a finding these "interests" were thought of, let alone articulated, during the decision making process. Even the court's use of the term "decision making process" rings untrue in light of the manner in which the decisions regarding out-of-state hospitals were made. DPW did not "reasonably determine" anything regarding out-of-state hospitals. Defendants did not attempt to acquire information on out-of-state hospitals. They did not inquire about which, if any, out-of-state hospitals were frequent providers. They did not inquire as to what impact their decision would have on the hospitals. In its post-trial reply brief at page 57, plaintiff provides a telling summary of how and why decisions on out-of-state hospitals were arrived at. Citing and quoting from Mr. Debrunner's testimony, plaintiff explains:

> [O]ut-of-state hospitals reimbursement had no perceived political implications, Transcript at 498, lines 10–15; ... no empirical studies were done to determine how to reimburse out-of-state hospitals, Transcript at 498, lines 16–19; ... no one was complaining, Transcript at 498, lines 23–25; and ... 'why fix what ain't broke.' Transcript at 499, lines 7–9.

The court finds defendants have not articulated a rational connection between their asserted interests and the classifications of in-state versus out-of-state hospitals. Defendants' decision to classify out-of-state hospitals in the manner they did was arbitrary, not related to legitimate state interests and the classification has resulted in invidious discrimination. Defendants have violated plaintiff's Fourteenth Amendment rights.

*Administrative Appeals System*

Federal law requires states participating in the medicaid program to have an appeals process whereby payment rates can be reviewed. 42 U.S.C. § 1396a(a)(37); 42 C.F.R. § 447.253(c). The federal regulation states:

> *Provider appeals.* The medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.

42 C.F.R. § 447.253(c). Plaintiff contends defendants' appeals system is legally inadequate because it is undisputed that were WVUH to appeal its payment rate, it absolutely could not obtain relief if the out-of-state methodology had been correctly applied. Pennsylvania defends the validity of its appeals process asserting DPW has the authority to hear and determine challenges to the validity and constitutionality of its regulations.

When Congress revised the medicaid statutes it recognized the importance of an

---

**3.** The court has already discussed (see pages 45–46 of the memorandum) the irrationality of DPW's reasoning regarding payment of DME costs.

adequate appeals process. Early on, HCVA expressed its concern regarding the appealability of individual facilities' rates.

The revised regulations require each State agency to develop an appeals procedure that allows a provider to submit evidence to the agency and seek prompt administrative review of its payment rate. We believe the appeals requirement described above is needed because individual facility rates will not receive Federal review under the revised regulations.

*We believe that individual facilities must be given some opportunity to request review and adjustment of their rates.*

46 Fed.Reg. 47968–47969 (September 30, 1981) (emphasis added). After receiving invited comments on appeals regulations, HCVA iterated its position on reviewable rates. Displaying confidence in the states' abilities to recognize the need for rate reviewability and to promulgate adequate appeals systems, HCVA declined to write-into the regulations provisions on retroactive or prospective adjustments. It stated: "We believe that fair and reasonable rate adjustments are implicit in an appeals process and see no need for a prescriptive Federal requirement." 48 Fed.Reg. 56052 (December 19, 1983). The plain language of the regulation and the pertinent legislative history make it clear legally sufficient appeals systems provide for individual facilities to meaningfully challenge their rates. To the court, this means a facility can have the *propriety* of its rate reviewed, not merely the accuracy of the application of the methodology employed to arrive at the rate.

The plaintiff in *Mary Washington Hosp., Inc. v. Fisher*, 635 F.Supp. 891 (E.D.Va. 1985) challenged Virginia's appeals process. The parallels of the Virginia system to the Pennsylvania system are so strong that extensive quoting from that case is appropriate here. Discussing the Virginia appeals provision, the court stated:

This appeals provision states little more than the hospitals can appeal the application of the principles of reimbursement but they cannot appeal the principles of reimbursement themselves.... [T]his

means that a hospital could appeal only on, e.g., whether it was properly categorized as ... rural instead of urban. Evidence that a particular hospital's costs were high for its peer group because of special, necessary, and expensive services which it alone offered could not justify any relief, even partial, from the general rate under ... [Virginia's] interpretation. Likewise evidence that a hospital's costs were higher than those of its peer group for reasons beyond its control would not get a hospital any additional reimbursement under Virginia's system, even if that hospital's participation in the Medicaid program was crucial to ensure certain Medicaid recipients "reasonable access" to hospital services.

The Court is satisfied that Virginia's appeals provision, as interpreted, is unreasonably and arbitrarily narrow.

*Id.* at 904. This court agrees with the *Mary Washington* court in that

the more general the rate-setting system is, the stronger the need for some appropriate method of accomodating particular situations that the general rules do not adequately address.... If, ... a state fixed a single reimbursement rate across the state, there would almost certainly be a need for a broader form of appeal or exception process that would allow individual hospitals relief from the general rule.

*Id.* at 903.

■ The observation regarding a single reimbursement rate and the concomitant need for a broad form of appeal is as accurate in a situation where the single rate is set for out-of-state hospitals as it is where the single rate is set for in-state hospitals. The impropriety of the single rate should be open to challenge by individual providers. In the instant case, defendants admit WVUH cannot appeal the fact of its rate. It can only appeal the application of the methodology. For all practical purposes, the only question entertained on appeal would be "was WVUH properly categorized as an out-of-state hospital rather than an in-state hospital." That question

would be answered in the affirmative, thus effectively ending all inquiry into WVUH's rate. The court finds Pennsylvania's appeals system legally insufficient because a provider with a facially bona fide rate challenge cannot obtain a meaningful review. If an appeals systems provides only that a rate adjustment challenge begin and end with an inquiry into whether the numbers were correctly crunched and whether the "i's" were dotted and "t's" crossed, that appeals system does not meet the federal standards.

The defendants argue the appeals system is legally sufficient because the agency is empowered to rule on the validity and constitutionality of its own regulations. *See* the authority cited at 34–35 of Defendant's Post–Trial Memorandum. The court agrees, as a general proposition, Pennsylvania state agencies are so empowered; however, as a practical matter such empowerment is ineffective in the instant matter. The state's position regarding the constitutionality of its prospective payment system and its administrative appeals process is quite clear: both fully comport with federal regulations and are constitutionally sound. This court will not force a provider to take its challenges to an agency when the agency's adjudication of the challenges is a foregone conclusion. *See Delaware Valley Convalescent Center v. Beal,* 488 Pa. 292, 412 A.2d 514 (1980) (where nothing in the record suggests a provider would not be afforded a meaningful administrative agency review, exhaustion is required as a prerequisite to judicial review).

Defendants have admitted were WVUH to appeal its rate, the rate itself would not be adjusted. Only the application of the formula would be reviewed. This means WVUH "can appeal the application of the principals of reimbursement but [it] ... cannot appeal the principals of reimbursement themselves...." *Mary Washington* at 904. As discussed above, this is inadequate under the federal law.

Lastly, defendants point out the Secretary of Public Welfare has the authority to invalidate, waive or grant exceptions to any of the regulations. The statutory authority for this purported power is 1 Pennsylvania Code sections 33.61, 35.18, 35.187(8), and 35.190. After carefully reading these code sections, the court finds they do not address the Secretary's authority to waive regulations or grant exceptions to them. They serve merely as a "how to" for aggrieved parties. 1 Pennsylvania Code section 33.61 concerns how to get a waiver of the formal requirements of the appeals process. It has nothing to do with obtaining a waiver of a substantive regulation. Next, section 35.18 delineates the appropriate content and form for petitions for waivers. Again, nothing in this section relates to the power of the Secretary to grant petitions. Section 35.187(8) speaks to the authority of presiding officers to certify questions to the agency head for disposition by the agency head. Finally, section 35.190 concerns the procedure whereby an aggrieved party can appeal the rulings of presiding officers: subsection (a) discusses the propriety of interlocutory appeals to the agency head during the pendency of hearings; subsection (b) discusses the requirements for "offers of proof" made in connection with an objection to a ruling on proffered oral testimony; and subsection (c) discusses the significance of the agency head's timetable for rendering decisions. Again, nothing in this section bears on the Secretary's purported authority to waive substantive regulations.

The case law cited in support of defendants' contention on the Secretary's authority is almost as unpersuasive as the statutory support. In *Stanley v. Commonwealth, Department of Public Welfare,* 112 Pa.Commw. 157, 535 A.2d 674 (1987), the Secretary had discretion to approve payment of an infant's hospital bill where the parents failed to supply information substantiating eligibility. In *Quincy United Methodist v. Commonwealth, Department of Public Welfare,* 109 Pa.Commw. 230, 530 A.2d 1026 (1987) the Secretary had discretion to permit an untimely appeal of an audit report. From the authority cited by defendants, the court cannot find the Secretary's power, whatever the extent of it may be, is a substitute for an otherwise invalid appeals process. The cases cited by

defendants involve situations wherein the Secretary is waiving mere procedural requirements. In the *Stanley* case, the Secretary had the discretion to waive the requirement that certain information be submitted before benefits could be granted. In the *Quincy* case, the Secretary had the power to waive the time limitation for filing an appeal. Neither of these cases supports the contention the Secretary can waive substantive regulations. WVUH is not requesting a simple time extension or an exception from a technical formality. Rather, it requests a total exemption from the state's entire medicaid reimbursement methodology. It has not been demonstrated the Secretary has the power to grant such a request. The seemingly unfettered discretion of a state official cannot serve as a substitute for a full-blown, meaningful appeals *process*.

*Scope of Relief*

In this action plaintiff sues state officials in their official capacities. Thus the state, as the real party in interest, can invoke its sovereign immunity protection under the Eleventh Amendment.[4] *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984). Defendants have raised a sovereign immunity defense to all retrospective relief demanded by plaintiff.

The law on sovereign immunity is not carved in stone. Since the first exception to the Eleventh Amendment was established in 1908, (*Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)), courts have struggled to define the Amendment's natural boundaries. In *Ex Parte Young, supra,* the Court held the protection of the Amendment was unavailable in a suit challenging the constitutionality of a state official's enforcement of a state law. The sole remedy in *Young* was prospective relief.

The distinction between retrospective and prospective relief has blurred with courts' attempts to provide meaningful equitable relief to wronged parties. *See, e.g., Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Court upheld district court's order requiring state defendants to pay one-half of the costs attributable to remedial measures aimed at curing the effects of prior school segregation); *Clark v. Cohen,* 794 F.2d 79 (3d Cir.1986), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986) (appeals court upheld district court's order requiring state to provide program of services directed at remedying harm incurred by woman wrongfully confined to a mental institution). Although there is no bright line distinction, the differences between the two types of relief are discernible. In *Brown v. Eichler,* 664 F.Supp. 865 (D.Del.1987), the court efficiently summarizes the boundaries of appropriate remedies allowable under the Eleventh Amendment.

> The distinction between retrospective and prospective relief depends not on when the relief is awarded but on when the violation for which relief is awarded occurs. All relief, whether damages or injunctive, must be given in the future. If that relief is aimed at remedying a past harm, it is considered retrospective relief and barred by the Eleventh Amendment. By contrast, a remedy aimed at curing a present violation in the future is considered prospective relief. Last, direct awards of monetary relief against the State are forbidden, while awards with only an ancillary effect on the State treasury are permissible.

*Id.* at 872–73 (citing *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)).

Assuming the court orders defendants to develop a new appeals system, WVUH asks this court to order defendants to permit the Hospital to appeal its fiscal years 1984 and 1985 reimbursements under the new appeals system. This request is nearly identical to that of the plaintiffs in *Brown*. In that case, the plaintiffs challenged Dela-

---

**4.** The eleventh amendment to the United States Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

ware's federal tax refund intercept program. The court found state procedures violated the due process rights of obligated parents and non-obligated spouses of obligated parents due to a failure to inform them of potential defenses. The plaintiffs requested the court to enjoin the state to re-do the past procedures for the 1983 and 1984 intercept of refund checks using the new court-ordered procedures. The 1983 intercept occurred before the action was commenced; the 1984 intercept occurred afterwards. The court addressed the two intercepts separately. The court's framing of the sovereign immunity issue regarding the 1983 intercept works quite well for the framing of the sovereign immunity issue in the instant action for the fiscal years 1984 and 1985. The *Brown* court stated the issue thusly:

> The question for this Court with respect to the 1983 intercept is whether an injunction aimed at remedying a past due process violation that only has an ancillary effect on the state treasury—only new hearings will be required; there will not be a direct award of money—can be issued in the context of a case where there is an ongoing state official's violation of federal law, but the injunction for new hearings for the past is not needed to remedy the situation for the future.

*Id.* at 873 (footnote omitted).

In the instant action, the court is concerned with an on-going state official's violation of federal law; the requested injunction would have only an ancillary effect on the state treasury; and the injunction would be aimed at remedying a past violation. The unusual combination of factors involved in the question of relief in this situation was not lost on the *Brown* court. That court noted: "This question is a somewhat anomalous one because the relief requested is neither retrospective monetary relief nor prospective injunctive relief. Instead, it is retrospective, injunctive relief." *Id.*

Two Supreme Court cases, *Milliken v. Bradley, supra,* and *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) contained some element of retrospec-

tive relief and bear examination. In the school segregation case, *Milliken,* the relief was aimed at eliminating

> the continuing effects of past misconduct. Reading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skills of specially trained teachers. That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates *prospectively* to bring about the delayed benefits of a unitary school system.

433 U.S. at 290, 97 S.Ct. at 2762. Although the violation was antecedent, it caused deficiencies in the students which, if not remedied, would continue to harm them far into the future.

In the *Quern* case, the Court held a federal court could order state officials to send a notice to victorious plaintiff class members informing them, "that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures which they may wish to pursue." 440 U.S. at 332, 99 S.Ct. at 1139. The Court found such a notice would not lead "inexorably" to the state paying past benefits. The chain of causation between the sending of the notice and the payment of benefits retroactively

> is by no means unbroken; it contains numerous missing links, which can be supplied, if at all, only by the State and members of the plaintiff class and not by a federal court. The notice ... simply apprises plaintiff class members of the existence of whatever administrative procedures may already be available under state law by which they may receive a determination of eligibility for past benefits.... [W]hether or not the class member will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court.

*Id.* at 347–48, 99 S.Ct. at 1148–49 (footnote omitted). The court viewed the notice and its possible retrospective element as ancillary to the prospective relief already ordered. In a later Supreme Court case,

*Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), the Court characterized the sending of the *Quern* notices as a "mere case-management device." *Id.* at 71, 106 S.Ct. at 427.

The distinctions between the instant action and *Milliken, Quern,* and the Third Circuit's *Clark* (discussed briefly *supra* at pages 523–524 of this memorandum), are determinative on the issue of sovereign immunity. In *Milliken* and *Clark* it was determined the plaintiffs would continue to suffer harm because of violations visited upon them in the past by their respective state officials. The relief in those cases was aimed at eradicating those continuing harmful effects; the relief was not aimed at compensating those plaintiffs for harm done and past. In the instant action, the only continuing harm is the unrecovered loss of money. While the court is not insensitive to WVUH's sizeable monetary loss, the court cannot order relief which will almost certainly result in the recovery of money for the sole purpose of recovering money. The court cannot order the plaintiff be made whole if it is money only which it needs to be made so. Like the violations in *Brown,* the violations in the case at bar are "discrete for each year." *Brown,* 664 F.Supp. at 874. There is a continuing effect on the Hospital caused by its having been denied money it was entitled to, but the nature of that harm is not such that it will affect the future of the institution in a fundamental way. The court has recognized WVUH cannot continue to sustain the level of losses it has been sustaining and still be certain of providing the services it does presently. However, there is nothing in the record which informs the court that recovery of the alleged 2.3 million dollars owed it for the fiscal years 1984 and 1985 are crucial to the Hospital's future viability.

The *Quern* situation appears to be somewhat closer to plaintiff's than the other cases discussed, but it too is meaningfully distinguishable. In *Quern,* the approved notice gave no more to the class members "than what they would have gathered by sitting in the courtroom. [ ... ]" 440 U.S. at 349, 99 S.Ct. at 1139 (quoting *Jordan v. Trainor,* 563 F.2d 873, 878 (7th Cir.1977), *aff'd sub nom., Quern v. Jordan, supra* ). The court approved only of plaintiffs being notified of a possibility of consideration for past benefits. It was not at all certain the sending of the notice would have any effect on the state's treasury (beyond the cost of sending it—which was not objected to by the state). In the instant matter there is no class; there is only one plaintiff. WVUH need not be specially notified of the status of its federal court case, as did the *Quern* plaintiffs. The *Quern* notice advised plaintiffs of the existence of the administrative process available to them generally. It was not directed specifically to facilitate awards of past benefits. That past benefits might be available was ancillary to the prospective relief regarding availability of future benefits. In contrast to this is WVUH's request which focuses only on the collection of money allegedly owed for past violations. There is no prospective component to what the Hospital requests. Its requested relief goes only to compensation for past violations. The court is aware that even if it were to order the state to permit WVUH to appeal its fiscal years 1984 and 1985 rates under a new system, a system developed in keeping with this memorandum, there is no guarantee the Hospital would collect a specific dollar amount. However, assuming the development of a valid, constitutional methodology, reimbursement rate, and appeals system, WVUH would undoubtedly qualify for *some* compensation.

Finally, as the *Brown* court observed, [l]ying at the core of the prospective-retrospective distinction in the Eleventh Amendment jurisprudence is the inherent tension between state sovereign immunity and the Federal Supremacy Clause.[12][5] '[T]he availability of prospective relief of the sort awarded in *Ex Parte Young* gives life to the Supremacy Clause, ....

**5.** "12. 'This Constitution, and the Laws of the United States ... shall be the supreme Law of the Land.' U.S. Const. art. VI [cl. 2]."

But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.' ... [*Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985).] A balance between the constitutional provisions has been struck at the point of the retrospective-prospective distinction. *When the purpose of a remedy is only to compensate for the past violations, the Eleventh Amendment takes precedence over the Supremacy Clause.*

*Brown,* 664 F.Supp. at 875 (emphasis added). The court finds the sole purpose for WVUH's requested relief of ordering the state to entertain an appeal for the years 1984 and 1985 is to compensate for past violations. The Eleventh Amendment bars such compensation.

The court finds, however, the Eleventh Amendment does not bar an injunction ordering the state to permit the Hospital to appeal the reimbursements it received from the date the complaint was filed. *Brown,* 664 F.Supp. at 876; *Smith v. Onondaga County Support Collection Unit,* 619 F.Supp. 825 (N.D.N.Y.1985). Although such an appeal is aimed at curing past reimbursement deficiencies, this relief, when first requested by WVUH, was prospective. Ordering the state to conduct appeal hearings for the period of time after the complaint was filed is a proper ordering of prospective, injunctive relief. *Brown,* 664 F.Supp. at 876. However, this court cannot order a recovery of money damages. *Id.* at 876 n. 13.

*Conclusion*

The court finds Pennsylvania's prospective medicaid program as it applies to WVUH does not comply with federal law; through its treatment under the program, WVUH's Fourteenth Amendment equal protection rights have been violated; and the administrative appeals system, as it applies to WVUH, is inadequate and does not comply with federal law. An appropriate order will issue.

ORDER

In accordance with the accompanying memorandum, IT IS HEREBY ORDERED THAT:

1) the court declares the Commonwealth of Pennsylvania's medicaid prospective payment system as it applies to West Virginia University Hospital is violative of federal law;

2) the court declares the Commonwealth of Pennsylvania's medicaid administrative appeals system as it applies to West Virginia University Hospital is violative of federal law;

3) the court declares plaintiff's Fourteenth Amendment equal protection rights have been violated as a result of its treatment under the Commonwealth of Pennsylvania's medicaid prospective payment system;

4) defendants shall, within ninety (90) days of the entry of judgment, formulate (and seek approval of same from the appropriate federal authority) a methodology and a medicaid prospective payment system for West Virginia University Hospital consistent with and in conformity with federal law as discussed in the accompanying memorandum;

5) defendants shall, within ninety (90) days of the entry of judgment, formulate (and seek approval of same from the appropriate federal authority) an adequate and meaningful (as those terms are used in the accompanying memorandum) medicaid administrative appeals or exception system for West Virginia University Hospital;

6) defendants shall permit West Virginia University Hospital to utilize the new appeals or exception system to challenge its reimbursements from the date this action was commenced;

7) motions for reconsideration shall not be filed. However, the court will entertain motions to clarify this order to ensure it is consistent with the body of the accompanying memorandum;

8) plaintiff's request for attorneys' fees pursuant to 42 United States Code section 1988 is granted. Counsel for the parties shall attempt to agree on the amount of said fees. On or before December 14, 1988 counsel shall submit a joint fee proposal to the court, or if no agreement can be

reached, counsel shall separately file fee proposals;

9) judgment will be entered upon the court's determination of appropriate attorneys' fees; and

10) defendants' motion to file supplemental briefs is denied.